TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
DEVON L. FLANAGAN, Senior Trial Attorney
ANGELA MO, Trial Attorney
KAMELA A. CASCHETTE, Trial Attorney
CHRISTIAN CARRARA, Trial Attorney
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Tel: (202) 305-0201 (Flanagan); (202) 514-1707 (Mo);
    (202) 305-0340 (Caschette); (202) 305-0217 (Carrara)
Email: Devon.Flanagan@usdoj.gov; Angela.Mo@usdoj.gov
        Kamela.Caschette@usdoj.gov; Christian.Carrara@usdoj.gov

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:24-cv-00448 |
| *Plaintiff*, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| VERNON D. MILLER, individually and d/b/a Dutch Creek Farm Animal Park, | **EXPEDITED BRIEFING REQUESTED** |
| *Defendant*. | |

i

## EXHIBIT LIST

Exhibit 1 – Declaration of Dr. Kristin P. Ray

Exhibit 2 – USDA License for Vernon D. Miller

Exhibit 3 - September 14, 2023 Inspection Report

Exhibit 4 - September 27, 2023 Inspection Report

Exhibit 5 - October 4, 2023 Inspection Report

Exhibit 6 - October 18, 2023 Routine Inspection Report

Exhibit 7 - October 18, 2023 Focused Inspection Report

Exhibit 8 - November 1, 2023 Inspection Report

Exhibit 9 - January 22, 2024 Inspection Report

Exhibit 10 - April 12, 2024 Inspection Report

Exhibit 11 - July 1, 2024 Inspection Report*

Exhibit 12 - September 24, 2024 Inspection Report*

Exhibit 13 – Declaration of Jessica Watson

Exhibit 14 – USDA Official Warning, December 21, 2023

Exhibit 15 – Notice of 21-Day Suspension

Exhibit 16 – Declaration of Carrie Bongard

Exhibit 17 – Notice of Manual Filing – USDA Videos

* Exhibits 11 and 12 have been redacted to protect personal identifiable information of individuals not directly involved in this litigation.

The United States moves for a temporary restraining order ("TRO") and preliminary injunction under Federal Rule of Civil Procedure 65(a) and (b) and 7 U.S.C. §§ 2159(a) and 2146(c) against Defendant Vernon D. Miller. Miller runs a zoo called the Dutch Creek Farm Animal Park (the "Facility"), which houses over 350 animals for public exhibition. Miller also breeds and sells dogs from the same location in Shipshewana, Indiana. Miller holds a license issued by the United States Department of Agriculture ("USDA") pursuant to the Animal Welfare Act ("AWA" or "the Act") and is required to comply with the AWA and its regulations and standards for the humane care, handling, transportation, treatment, and sale of animals covered by the Act.

Since September 2023, USDA officials have cited Miller for 90 violations of the AWA and its regulations and standards. Despite multiple explanations and warnings, Miller has continually violated the law by failing to provide adequate veterinary care to dozens of animals, exposing animals to filthy, unsanitary conditions that place them at risk of illness, failing to provide animals with sufficient clean and palatable food and water, and housing animals in enclosures that fail to protect the animals from the elements, the public, or each other. Miller has also failed to maintain legally required records. Relief is warranted on two grounds: (1) Miller has violated the AWA and its regulations and standards and is likely to continue to do so absent injunctive relief, 7 U.S.C. § 2146(c); and (2) Miller's violations are placing the health of animals at his Facility in serious danger, 7 U.S.C. § 2159(a). The requested preliminary relief is essential to prevent irreparable harm to the United States' interests and the animals at Miller's facility, and to promote the public interest. Accordingly, the Court should enter the relief requested in the United States' Motion.

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted the AWA in part to "insure that animals intended . . . for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1). The

AWA (7 U.S.C. § 2131 *et seq.*) regulates the commercial exhibition, transportation, purchase, sale, housing, care, handling, and treatment of "animals," as that term is defined in the Act, and in the regulations issued under the Act. *See id.* § 2132(g); 9 C.F.R. § 1.1. Pursuant to authority granted in the AWA, the Secretary of Agriculture has issued regulations and standards that apply to animal dealers and exhibitors. *See* 7 U.S.C. §§ 2142, 2143(a), 2151; 9 C.F.R. Parts 1, 2 ("regulations"), 3 ("standards"). These provisions set forth minimum requirements for, among other things, how animals are to be handled, housed, fed, transported, and provided veterinary care.

Anyone who falls within the statutory definition of a dealer[1] or exhibitor[2] must hold a valid USDA license. 7 U.S.C. § 2134; *see also* 9 C.F.R. §§ 1.1 (licensee definitions), 2.1(a) (licensing requirements). An operator of a facility that breeds and sells dogs and displays animals to the public is a dealer and exhibitor. *Id.* § 1.1. The AWA authorizes USDA to inspect licensees, including their facilities, animals, and records, during any business hours to detect violations of the Act or its regulations or standards. 7 U.S.C. §§ 2140, 2146(a); 9 C.F.R. § 2.126.

The U.S. district courts have "jurisdiction specifically to enforce, and to prevent and restrain violations" of the AWA and "shall have jurisdiction in all other kinds of cases arising under" the AWA except in one instance not applicable here. 7 U.S.C. § 2146(c). If the Secretary has reason to believe that a dealer "is placing the health of any animal in serious danger" in violation of the AWA or its regulations or standards, he shall notify the Attorney General, who

---

[1] The AWA defines a "dealer" as "any person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of . . . any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet[.]" 7 U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1 (definition of "dealer").

[2] An "exhibitor" is defined as "any person (public or private) exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation, as determined by the Secretary, and such term includes carnivals, circuses, and zoos exhibiting such animals whether operated for profit or not[.]" 7 U.S.C. § 2132(h); 9 C.F.R. § 1.1 (definition of class "C" licensee).

may seek a TRO or injunction to prevent any such person from operating in violation of the Act's requirements. *Id.* § 2159(a). The district court "shall, upon a proper showing [of serious danger], issue a [TRO] or injunction" that remains in effect until an administrative action brought by the Secretary of Agriculture, pursuant to 7 U.S.C. § 2149, is either dismissed by USDA, set aside on appeal, or until a final order is issued. *Id.* § 2159(b).

## FACTUAL BACKGROUND

Miller owns and operates a facility called the Dutch Creek Farm Animal Park in Shipshewana, Indiana. *See Dutch Creek Farm Animal Park,* https://www.dutchcreekfarmanimalpark.com/ (last visited October 23, 2024).[3] The Facility includes a zoo, where the public can interact with various animals via drive-through and walk-through exhibits, and a dog breeding operation. *Id.*; *see also* Ex. 1 ¶ 7 (Declaration of Dr. Kristin P. Ray). As of September 2024, the Facility had nearly 400 animals in its inventory, including dogs, ring-tailed lemurs, emu, bison, llamas, and camels. To engage in this AWA-regulated activity, Miller holds USDA Class "C" license number 32-C-0224. Ex. 2 (Miller USDA license).

Miller has a pattern and practice of violating the AWA and its regulations and standards. During ten inspections conducted or attempted since September 2023, USDA found 90 AWA violations at the Facility. *See* Ex. 3 (Sept. 14, 2023 Inspection Report); Ex. 4 (Sept. 27, 2023 Inspection Report); Ex. 5 (Oct. 4, 2023 Inspection Report); Ex. 6 (Oct. 18, 2023 Routine Inspection Report); Ex. 7 (Oct. 18, 2023 Focused Inspection Report); Ex. 8 (Nov. 1, 2023 Inspection Report); Ex. 9 (Jan. 22, 2024 Inspection Report); Ex. 10 (Apr. 12, 2024 Inspection Report); Ex. 11 (July 1, 2024 Inspection Report); Ex. 12 (Sept. 24, 2024 Inspection Report).

---

[3] Although the Dutch Creek Farm Animal Park is not a registered business in Indiana, Miller does business under this title.

Miller has accumulated more citations than any other USDA-licensed facility in the last two years. Ex. 13 ¶ 5 (Declaration of Jessica Watson). Miller's most frequent violations fall into the following categories: (1) failing to provide adequate veterinary care; (2) housing animals in filthy, unsanitary conditions that place them at risk of illness; (3) failing to provide sufficient clean food and water to the animals; (4) housing animals in enclosures that fail to protect the animals from the elements, the public, or each other, or otherwise violate the AWA regulations and standards; and (5) failing to make and maintain accurate and complete records and other legally required documents. These violations include failing to provide veterinary treatment for animals with open wounds at risk of infection, Ex. 3 at 2, housing animals in enclosures with three to twelve inches of feces, Ex. 7 at 8, and housing animals in enclosures with live electrical wires and propane and diesel tanks, Ex. 3 at 7; Ex. 7 at 2, 6, and 10.

In December 2023, USDA issued Miller an Official Warning for violations including inadequate veterinary care, improper handling of animals, and housing incompatible animals together. Ex. 14 (USDA Official Warning, December 21, 2023). Despite this warning, Miller's violations have continued. At his most recent inspection on September 24, 2024, inspectors discovered that at least seven animals at the Facility had died within the previous two and a half months. Ex. 12 at 2. Only one of those animals had been seen by a veterinarian before dying. Miller's history of not providing adequate veterinary care to animals exposed to unsanitary and unsafe conditions has likely led to numerous animal deaths and will continue to in the future.

Because of the repeat violations Miller has incurred, USDA served Miller with a Notice of 21-Day Suspension on October 9, 2024. Ex. 15 (Notice of 21-Day Suspension). Under the suspension, Miller cannot buy, sell, transport, exhibit, or deliver for transportation any AWA-regulated animal until October 31, 2024. USDA is also preparing to file an administrative action

4

seeking a cease and desist order and the revocation of Miller's license pursuant to 7 U.S.C. § 2149.

## STANDARD OF REVIEW

The Court has jurisdiction "to enforce, and to prevent and restrain violations" of the AWA. 7 U.S.C. § 2146(c). In determining whether to grant a TRO or preliminary injunction, courts consider four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant is likely to suffer irreparable harm absent the injunction; (3) whether the balance of equities tips in the movant's favor; and (4) whether the injunction would serve the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022). The party seeking the injunction bears the burden of justifying such relief. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

While Section 2146(c) requires the application of the four equitable factors, Section 2159 of the AWA does not, because it mandates that courts "*shall*, upon a proper showing [of serious danger], issue a temporary restraining order or injunction." 7 U.S.C. § 2159(b) (emphasis added). When required by the statutory text, courts forgo the typical four-factor analysis for preliminary injunctive relief and focus on the findings required by the statute. *See Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1577 (2024) (the four-factor preliminary relief test does not apply if the statutory text contains "specific instruction that suggests Congress altered the traditional equitable rules"); *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (holding that, when a statute "mandates injunctive relief as a remedy for a violation—or impending violation—of the statute, it has effectively constrained the courts' traditional discretion to determine whether such relief is warranted"). Courts have determined that Section 2159 is not subject to the four-factor test because specific relief is mandatory upon a proper showing of serious danger. *United States v. Lowe*, No. 20-cv-0423-JFH, 2021 WL 149838, at *14 (E.D. Okla., Jan.

15, 2021); *United States v. Gingerich*, No. 4:21-cv-283-SMR-SHL, 2021 WL 6144690, at *2 (S.D. Iowa Sept. 28, 2021).

## ARGUMENT

The United States meets the standard for preliminary injunctive relief for its claims under 7 U.S.C. § 2146(c), Compl. ¶¶ 188-206, and 7 U.S.C. § 2159, Compl. ¶¶ 178-187. First, Miller has violated the AWA and its regulations and standards in numerous ways. Second, the combined effect of these violations and Miller's ongoing practices is placing the health of animals at the Facility in serious danger.

### I.    The United States Is Likely to Succeed on Its Section 2146(c)-Based Claims.

#### A.    Failure to Provide Adequate Veterinary Care.

Again and again, Miller has failed to conduct adequate observations of the animals at his Facility, failed to alert a veterinarian when animals have shown signs of illness, injury, or distress, and failed to implement a plan to adequately prevent, diagnose, treat, and control diseases and injuries, all in violation of the AWA regulations and standards. 9 C.F.R. §§ 2.40, 3.13. As a result, USDA inspectors often find animals in need of veterinary care at the Facility, and an unusually high number of animals have died without veterinary care in recent months.

##### 1.    Exhibited Animals

Miller has failed to have and implement a program of adequate veterinary care for the animals he exhibits, in violation of 9 C.F.R. § 2.40. AWA regulations require each dealer or exhibitor to have an attending veterinarian, with training or experience in the animals being attended, who "shall provide adequate veterinary care" to the licensee's animals. 9 C.F.R. §§ 1.1 (definition of "attending veterinarian"), 2.40(a). Dealers and exhibitors must have and maintain programs of "adequate veterinary care" that include, among other things, "[t]he use of appropriate

methods to prevent, control, diagnose, and treat diseases and injuries," "[d]aily observation of all animals to assess their health and well-being," and, if the daily observations are carried out by someone other than a veterinarian, "a mechanism of direct and frequent communication" such that "timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian." 9 C.F.R. § 2.40(b). Miller has failed to comply with these requirements at almost every inspection of his Facility conducted by USDA since September 2023.

At the September 14, 2023 inspection, USDA inspectors noticed several animals in obvious need of veterinary care, and yet, Miller had either not noticed their afflictions or did not think they warranted calling his veterinarian. For example, a fallow deer had two large wounds on its neck, one of which was approximately three by four inches and covered with dried blood. Ex. 3 at 2, 14. A young camel was notably thin, and its legs and tail were covered with evidence of diarrhea. *Id.* at 2, 17-18. If left untreated, diarrhea can cause dehydration, malnutrition, or even death. Ex. 1 ¶ 19; Ex. 16 ¶ 13. Additionally, a lionhead rabbit had matted fur on its neck and front legs, which can cause skin irritation, open sores, or infection. Ex. 3 at 2, 19; Ex. 1 ¶ 22 n.1. Finally, a gray fox's eyes were clouded and grayish blue with yellowish-green discharge, and the skin around its eyes was bright pink. Ex. 3 at 2; *id.* at 16 (picture showing clear need for veterinary care).

The USDA inspectors required Miller to obtain veterinary care for these animals within a week. The inspectors returned to the facility on September 27, 2023, to conduct a focused inspection on the direct citations, and found the fox in the same state. Ex. 4 at 2, 5-6. Miller claimed he had contacted a veterinarian to provide care, but the veterinarian did not have experience with foxes and declined to examine it or recommend treatment. *Id.* at 2. At the next focused inspection a week later, the fox's eyes again looked substantially the same. *See* Ex. 5 at 4 (photograph). Miller told inspectors that the attending veterinarian had seen the fox and recommended moving its

shelter into the shade. But Miller had not moved the structure—ignoring the veterinarian's advice and violating the AWA. *Id.* at 2; 9 C.F.R. § 2.40(b)(2); *cf. id.* § 2.40(a)(2) (requiring attending veterinarian to have "appropriate authority to ensure the provision of adequate veterinary care").

At subsequent inspections, the veterinary care problems persisted. On October 18, 2023, USDA inspectors observed a young, thin highland cow in the petting zoo area with its back legs and tail covered in feces and its tail matted with fecal balls. Ex. 6 at 2. Two ostriches and an emu had extensive areas of bare skin with scarring, after another ostrich in their enclosure had plucked out their feathers. Ex. 7 at 2-3, 20, 22-23; Ex. 17 (Notice of Manual Filing – USDA Videos), 10/18/23 Video 1. An umbrella cockatoo and a scarlet macaw were also missing feathers—signs of aggression from another bird or self-harm due to stress. *Id.* at 3, 25-26, 85; Ex. 1 ¶¶ 53, 56. At the April 12, 2024 inspection, USDA inspectors saw a white-tailed deer with a large pink area of missing hair on the side of its neck. Ex. 10 at 2. Miller had not observed any of these problems or sought veterinary care for these animals, in violation of 9 C.F.R. § 2.40(b).

Miller's most recent veterinary care citation is perhaps the most troubling. At the September 24, 2024 inspection, USDA inspectors discovered that at least seven animals at the Facility had died since the July 2024 inspection. Ex. 12 at 2. Six of these animals had not received any veterinary care prior to their deaths. These included an audad,[4] a goat, and an African crowned crane, which Miller claimed must have all run into fences and broken their necks in the middle of the night, because they were each found dead unexpectedly on different mornings. *Id*; Ex. 1 ¶¶ 11-13. He made the same claim about a deer that had died in June 2024. Ex. 1 ¶ 13. Numerous animals running into fences and breaking their necks in a short period of time is extremely implausible. *Id.* ¶ 14. In addition, a fox and an alpaca had died in July 2024 without veterinary care, and an adult

---

[4] An audad is an animal related to goats and sheep that is originally from North Africa.

dog that gave birth to one puppy in the evening was found dead the next morning. Ex. 12 at 2. While it is impossible to determine cause of death without examining the animals' bodies, the female dog may have suffered from obstructed labor or other complications of labor that went undetected while she was unobserved overnight. Ex. 1 ¶ 11, 16. Miller did not have examinations or necropsies done to identify the cause of death for any of these animals[5] and did not have the attending veterinarian examine other animals in close contact with them to determine if a contagious illness, disease, or parasite may have been to blame. *Id.* ¶¶ 13, 15; Ex. 12 at 2. The high volume of unexplained deaths, along with Miller's history of failing to observe or request treatment for significant injuries, illnesses, or other conditions, demonstrates that Miller has repeatedly failed to establish and implement a program of adequate veterinary care for the animals he exhibits under his USDA license. 9 C.F.R. § 2.40.

### 2. Dogs in Miller's Breeding Program.

Miller has also failed to comply with the requirements for adequate veterinary care for dogs, in violation of 9 C.F.R. §§ 2.40 and 3.13. Dogs are subject to the general veterinary care requirements of § 2.40 as well as more specific provisions, which require dealers and exhibitors to provide all dogs with: complete physical examinations at least once a year, vaccinations for contagious or deadly diseases (like rabies, parvovirus, and distemper), sampling and treatment for parasites and other pests (including fleas, worms, and heartworm), and preventative care and treatment to ensure healthy and unmatted hair coats, properly trimmed nails, and clean and healthy eyes, ears, skin, and teeth. *Id.* § 3.13(a). Dealers and exhibitors also must maintain and make

---

[5] APHIS's Inspection Guide explains that necropsies may be appropriate as part of the provision of adequate veterinary care, particularly if there are "abnormally high death losses" or "significant unexplained mortalit[ies]." Animal Welfare Inspection Guide at 4-41, available at https://www.aphis.usda.gov/sites/default/files/Animal-Care-Inspection-Guide.pdf.

available for inspection medical records for dogs. *Id.* § 3.13(b), (c).

In October 2023, a dog named Janie had clear visible signs of an ear infection as well as matted fur around her ears. Ex. 6 at 2, 9, 10; Ex. 7 at 2, 17-19. Such matting can lead to ear infections, and ear infections cause discomfort and, if untreated, could lead to hearing loss. Ex. 1 ¶ 22. Miller had not identified or sought veterinary care for these issues, in violation of the requirement to prevent matted coats and maintain healthy ears. 9 C.F.R. § 3.13(a)(4). Miller has also failed to provide full physical exams for dogs in a timely manner, in violation of 9 C.F.R. § 3.13(a)(2). Ex. 10 at 2. Additionally, Miller failed to provide dogs with monthly heartworm prevention, grooming, nail checks, or skin and ear checks between December 2023 and at least April 2024, meaning he failed to follow his program of veterinary care, as required by 9 C.F.R. § 3.13(a). *Id.* at 2.

At an inspection on April 12, 2024, USDA inspectors noted that Miller did not have the required records of adult dogs receiving the annual rabies, parvovirus, or distemper vaccines required in his program of veterinary care and required him to promptly correct this violation to protect the dogs from contagious diseases. *Id.* at 2. However, Miller had not provided the dogs with parvovirus or distemper vaccines by the July 1, 2024 inspection. Ex. 11 at 2-3. And then again, at the September 24, 2024 inspection, Miller still had not provided the dogs with the required parvovirus and distemper vaccines. Ex. 12 at 2. Additionally, a new litter of puppies were old enough to be vaccinated, but Miller had no record of providing them with the protective vaccinations. *Id.* at 2, 15, 16.

Miller's failure to follow his program of veterinary care and provide appropriate preventative care and treatment to dogs that are part of his breeding program violates the AWA's standards and puts his dogs at risk of disease, injury, and needless suffering. 9 C.F.R. § 3.13(a).

Miller has violated and is likely to continue violating the AWA's requirements for adequate veterinary care, and the United States is likely to succeed on the merits of Claim 2.

**B.  Failure to Provide Sanitary Housing and Living Conditions.**

Miller has violated a number of the AWA's standards by providing unsanitary and unclean housing and living conditions for animals at his Facility. The AWA requires licensees to maintain sanitary conditions by removing animal feces and urine from enclosures as often as necessary to prevent contamination, minimize disease hazards, and reduce odors. 9 C.F.R. §§ 3.127(c), 3.131(a) & (c); *see id.* §§ 3.84(a), 3.158(a) & (c). Miller is also required to provide potable water and palatable food in clean and sanitary receptacles, and to store food in a manner that prevents spoilage, contamination, and vermin infestation. *Id.* §§ 3.1(e), 3.75(e), 3.129(a) & (b), 3.130, 3.150(e), 3.155(b), 3.156. But Miller has failed to meet these basic needs for animals at his Facility, instead allowing his animals to live in enclosures covered in excessive amounts of feces or debris, and for their food, water, and food and water containers to become covered in grime, algae, and other potential contaminants. These conditions expose the animals to risk of illness and disease transmission, including diseases like Avian influenza. Ex. 1 ¶ 28.

As shown in numerous photographs and videos, USDA inspectors have documented many instances of Miller allowing large amounts of excrement to accumulate in animal enclosures. Ex. 1 ¶¶ 26-30; Ex. 16 ¶¶ 26, 51; Ex. 3 at 7, 9, 11; Ex. 7 at 6, 8, 9; Ex. 12 at 3; *see* 9 C.F.R. §§ 3.84(a), 3.131(a), 3.158(a)(1). For example, during the October 18, 2023 inspection, the stalls for five cattle, two zebra, one wildebeest, one zebu, one fallow deer, four nilgai, and three eland each contained three to twelve inches of feces and had not been cleaned in months. Ex. 7 at 8, 64-74. And at the latest inspection on September 24, 2024—even though the inspectors saw Facility representatives going ahead of them to clean other enclosures before the inspectors reached them—

11

Miller was cited for having excessive fecal material in his raccoon enclosure for a third time. Ex. 12 at 3; Ex. 1 ¶¶ 26, 30.[6]

Miller has also allowed animal enclosures at his Facility to be contaminated by unsafe objects or substances. Ex. 3 at 7; Ex. 7 at 8; Ex. 12 at 3; *see* 9 C.F.R. §§ 3.127(c), 3.131(c). For example, rust, debris, dirt, and bird feces have accumulated in the nonhuman primate shelters, Ex. 3 at 7, and a plastic water bottle and plastic sandwich bag were left in a goat enclosure and a goat was seen chewing on the trash, Ex. 7 at 8.

Additionally, USDA inspectors have repeatedly cited Miller for failing to provide his animals with adequate access to clean, palatable food and water. Ex. 3 at 6, 9, 10-11; Ex. 7 at 5-9; Ex. 11 at 3; Ex. 12 at 3; *see* 9 C.F.R. §§ 3.1(e), 3.75(e), 3.82(a), 3.127(c), 3.129(a) & (b), 3.130, 3.150(e), 3.155(b), 3.156. At the October 18, 2023 inspection, APHIS inspectors saw food dishes in the kangaroo enclosure and the enclosure for the red-bellied macaw that had caked and discolored feed. Ex. 7 at 7, 9. The caking indicated that the Facility was not cleaning out uneaten food, and discoloration is a sign of mold. Ex. 1 ¶ 35. Miller also had open bags of bird feed and primate biscuits as well as 20 bags of dog food sitting on the ground, risking the food being spoiled, contaminated, or infested by vermin. Ex. 7 at 4, 5, 8; Ex. 1 ¶ 36. Additionally, APHIS inspectors saw water sources covered with a film of algae being provided for raccoons, fox, striped skunk, wallabies, the walk-through aviary, African crowned crane, two ducks, and three chickens, exposing those animals to risk of illness. Ex. 3 at 9-10; Ex. 1 ¶ 34.

Finally, APHIS inspectors have documented Miller's repeated failure to clean and sanitize food receptacles. For example, Miller uses PVC pipes to allow members of the public to give food

---

[6] Other animals housed in enclosures with excessive excrement during inspections include cavy, foxes, an Amazonian parrot, ring-tailed lemurs, a red-bellied macaw, peacocks, doves, pheasants, goats, and an alpaca. Ex. 1 ¶ 26.

(like Froot Loops cereal) to the ring-tailed lemurs, spider monkey, rhesus macaque, and raccoons. Ex. 1 ¶ 33. At three different inspections—including the most recent one in September 2024—the inside of those pipes was coated with a black/green grime. Ex. 3 at 6, 9; Ex. 7 at 6; Ex. 12 at 3. Inspectors also cited Miller for allowing a striped skunk's food dish to be contaminated with bird feces. In addition to the risk of disease posed by these unsanitary food receptacles, animals will stop eating or drinking from receptacles that are dirty enough, exposing them to risk of malnutrition, starvation, and dehydration. Ex. 1 ¶ 34.

Overall, Miller has shown a disregard for the sanitation and cleanliness of his animals' housing and living conditions and repeatedly violated the AWA and its regulations and standards. The United States is thus likely to succeed on Claim 3.

### C. Failure to Provide Safe and Hospitable Housing and Living Conditions.

Miller has violated 19 AWA standards and regulations governing the humane sheltering, housing, feeding, watering, separation, and handling of animals. Over multiple inspections, APHIS inspectors found violation after violation where Miller failed to provide adequate shelter from the elements; housed animals in enclosures that are in disrepair or contain hazardous objects, sharp points, or trash that could be ingested; failed to keep animals contained in their enclosures; failed to provide a sufficient amount of food and water; housed incompatible animals together even after they caused each other injury; and failed to implement sufficient barriers between the public and the animals. *See* 9 C.F.R. §§ 2.131(b)(1) & (c)(1), 3.6(a)(2), 3.52(b), 3.53(a)(1), 3.77(g), 3.78(b) & (c), 3.125(a), 3.126(d), 3.127(b)-(d), 3.130, 3.150(a), 3.153(a) & (b), 3.158(c), 3.160(b).

Shelters are important to shield animals from the elements and prevent discomfort, stress, injury, or illness. *See* 9 C.F.R. §§ 3.52(b), 3.78(b) & (c), 3.127(b). Yet the Facility effectively offered no shelter for many animals—such as African crested porcupines, a Prevost's squirrel,

rabbits, ring-tailed lemurs, a spider monkey, a macaque, pigmy goats, a fox, sheep, a highland calf, goats, cows, donkeys, a skunk, a red kangaroo, and zebu—because the shelters either contained holes that could allow in rain and wind or were too small to actually shelter the animals in the enclosure. Ex. 3 at 5-6, 7; Ex. 7 at 5-7; Ex. 1 ¶ 47; Ex. 16 ¶ 22.

Primary enclosures must also be in good repair to protect animals from injury and to contain them and have means of draining excessive water. *See* 9 C.F.R. §§ 3.53(a)(1), 3.125(a), 3.126(d), 3.127(c), 3.150(a), 3.158(c). Yet the primary enclosures for many of the animals had unrepaired damage or dangerous features—such as exposed nails, fences with rust or sharp points, and dug-up dig barriers—that exposed the animals to unnecessary risk of injury, infection, tripping, entrapment, and electrocution. *See* Ex. 3 at 4, 5, 7, 9; Ex. 7 at 6, 8; Ex. 10 at 3; Ex. 11 at 3. Other primary enclosures could not properly contain animals. *See* 9 C.F.R. §§ 3.53(a)(1), 3.127(d); *see also* Ex. 3 at 5, 7, 8, 9; Ex. 12 at 3, 13-14; Ex. 1 ¶ 42. For example, in July 2024, APHIS inspectors witnessed an ostrich escape from the drive-through enclosure. Ex. 11 at 2; Ex. 1 ¶ 42. Miller also allowed obvious hazards such as electrical wires, trash, wires and a hose from a diesel tank, and valves and tubes from a propane tank to remain in primary enclosures. *See* Ex. 3 at 7; Ex. 7 at 2, 6, and 10; Ex. 1 ¶ 49; Ex. 16 ¶¶ 16-17. Live electrical wires, for example, are hazards because animals can chew through them and be electrocuted. Ex. 3 at 7; Ex. 7 at 2; Ex. 1 ¶ 49; Ex. 16 ¶ 17. Other primary enclosures lacked proper drainage, resulting in muddy or wet enclosures with no dry path to food, water, and shelter and no dry resting area. *See* Ex. 7 at 7; Ex. 9 at 2; Ex. 1 ¶ 50. Such conditions increase the risk of disease-transmitting pests, exposure, and death from hypothermia, as well as deter animals from accessing essential food, water, and shelter. Ex. 1 ¶ 50.

Miller also failed to provide animals with adequate access to food and water, which could

cause dehydration, injury, illness, or distress. *See* 9 C.F.R. §§ 2.131(b)(1), 3.130. For example, at the September 14, 2023 inspection, APHIS inspectors observed ravenous behavior from animals in two large pasture enclosures when going through the enclosures on a wagon ride during which wagon ride participants were given containers of feed to give to the animals. *See* Ex. 1 ¶¶ 38-39; Ex. 16 ¶ 14. During the inspection, horned animals pushed other animals away, creating a risk of injury to the animals as they fought over the available food. Miller could have fed the animals in a manner that avoided this ravenous behavior and prevented reliance on the wagon ride passengers for food. *See* Ex. 16 ¶ 14. During other inspections, animals appeared to have no water available to them. *See* Ex. 6 at 2; Ex. 16 ¶ 37.

Miller also housed incompatible animals with each other, which the AWA prohibits because it can cause injury or death. *See* 9 C.F.R. §§ 3.153(b), 3.160(b). During a wagon-ride feeding, inspectors witnessed a zebra approaching the wagon kick a duck with its back leg, causing the duck to roll on its back, unable to stand. *See* Ex. 1 ¶¶ 39, 43; Ex. 16 ¶¶ 14-15; Ex. 17, 09/13/23 Video 1. A startled eland then ran away, stepping on other ducks. Ex. 3 at 3, 11; Ex. 1 ¶ 39; Ex. 16 ¶ 14. Birds were frequently housed with other incompatible birds—exhibiting visible signs of injury such as featherless areas, bleeding, scabbing, and missing tail feathers. *See* Ex. 7 at 2-3, 9, 10, and 26; Ex. 9 at 2-3; Ex. 1 ¶¶ 43, 56. For example, inspectors witnessed an ostrich plucking feathers from other large birds in its enclosure, and the other birds had extensive bald areas with scabbing and little to no feather regrowth. Ex. 7 at 2-3, 10; Ex. 1 ¶¶ 19, 43, 56. Miller has also failed to comply with the AWA's requirement for sufficient distance or physical barriers between animals and the general viewing public, which risks illness and injury to both animals and people. *See* 9 C.F.R. §§ 2.131(c)(1), 3.77(g); Ex. 3 at 3-4; Ex. 7 at 3-4; Ex. 1 ¶¶ 40-41. For example, the barrier around the ring-tailed lemurs' enclosure was leaning towards the enclosure in such a way

that it was possible for the general public to come into physical contact with the lemurs—concerning because such close contact presents a particularly high risk of spreading diseases such as tuberculosis from nonhuman primates to people. Ex. 7 at 5; Ex. 1 ¶ 41; Ex. 16 ¶¶ 39-40. For all these well-documented reasons, the United States is likely to succeed on Claim 4.

### D.  Exposing Animals at Facility to Psychologically Distressing Conditions.

Miller has violated AWA standards and regulations by exposing the animals at his Facility to psychologically distressing conditions. *See* 9 C.F.R. §§ 3.80(b)(1), 3.128, 3.153(b). Dealers and exhibitors are required to have enrichment plans to promote the psychological well-being of nonhuman primates and certain birds like macaws and cockatoos. *Id.* §§ 3.81, 3.154. These animals are intelligent, and lack of enrichment like toys and puzzles can result in the animals experiencing stress, behavioral issues, and self-injurious behaviors. Ex. 1 ¶ 53. Additionally, primary enclosures must have sufficient space to allow each animal to make "normal postural and social adjustments" with "adequate freedom of movement." 9 C.F.R. §§ 3.128, 3.153(b). For birds, that includes freedom to escape from other birds' aggression. *Id.* § 3.153(b). For nonhuman primates that are brachiating species (meaning they move by swinging from branch to branch), primary enclosures must have a height of at least 84 inches. *Id.* § 3.80(b)(1); *see* Ex. 1 ¶ 47. Inadequate space can cause animals to suffer from "malnutrition, poor condition, debility, stress, or abnormal behavior patterns" like self-mutilating behaviors. *Id.* §§ 3.128, 3.153(b); Ex. 1 ¶ 55.

At four consecutive routine inspections, Miller failed to have the required enrichment plan for birds and/or nonhuman primates, in violation of 9 C.F.R. §§ 3.81 and 3.154. *See* Ex. 3 at 6, 10; Ex. 7 at 5, 9; Ex. 9 at 2; Ex. 10 at 2. During at least one inspection, Miller also did not have enrichment devices in the enclosures for the umbrella cockatoo, blue and gold macaw, Amazonian parrot, or the red-bellied macaw. Ex. 1 ¶ 54; Ex. 3 at 6, 10. Additionally, the only enrichment item

observed for the ring-tailed lemurs was a plastic children's play structure in their enclosure, marked with dried feces. Ex. 1 ¶ 26, 54.

Miller additionally failed to provide animals with enclosures that allow them to make normal postural and social adjustments with adequate freedom of movement, in violation of 9 C.F.R. §§ 3.80(b)(1), 3.128, and 3.153(b). For example, at the October 18, 2023 inspection, a scarlet macaw was housed with a blue-and-gold macaw in a too-small cage. Ex. 7 at 9, 26. The scarlet macaw was missing tail feathers, indicating harassment from the other bird or self-mutilation. Ex. 1 ¶ 56. Further, during the January 22, 2024 inspection, inspectors saw a spider monkey in its winter enclosure that was 13 inches too short. Such a short enclosure prevents brachiating monkeys from engaging in natural movements and is detrimental to both their physical and behavioral well-being. *Id.* ¶ 55; Ex. 9 at 2. Despite this citation, the spider monkey was still in the same too-small cage during the April 12, 2024 inspection, in violation of 9 C.F.R. § 3.80(b)(1). Although the spider monkey was moved out of this cage for the summer and fall, Miller has made no indication that he intends to make any changes to the too-small enclosure before the monkey is returned to it for the winter. Ex. 1 ¶ 47.

Overall, Miller's repeated failure to provide adequate enrichment and large enough enclosures has placed animals in psychologically distressing conditions in violation of the AWA and its standards and regulations. The United States is thus likely to succeed on Claim 5.

### E.  Failure to Create and Maintain Complete and Accurate Records.

Miller has also failed to create and maintain complete and accurate records as required under the AWA, its regulations and standards. *See* 7 U.S.C. § 2140; 9 C.F.R. §§ 2.50(c)(1), 2.75(b)(1), 3.13(b).

Dealers and exhibitors must maintain detailed records of all animals present at their facility,

including information such as the animal's species, the date of acquisition or disposition, and information about who the animal was acquired from. 9 C.F.R. § 2.75(b)(1). Inventories for dogs require even more detail, such as the dog's identification number, age, and sex. *Id.* § 2.75(a)(1). Dealers and exhibitors must also keep copies of all medical records for the dogs at their facility and any dogs euthanized or otherwise disposed of within the last year. *Id.* § 3.13(b), (c).

Miller has repeatedly violated the AWA by failing to maintain complete and accurate records for dogs and other animals at his Facility. 9 C.F.R. §§ 2.50(c)(1), 2.75(b)(1), 3.13(b). For instance, during at least two inspections, medical records for dogs and puppies at his Facility lacked required vaccination and veterinary treatment records, in violation of 9 C.F.R. § 3.13(b). Ex. 3 at 4-5; Ex. 7 at 4-5. Miller has also repeatedly failed to properly identify his dogs and puppies, in violation of 9 C.F.R. § 2.50(c)(1). Ex. 3 at 3-4; Ex. 7 at 2-3. As far as the zoo animals, Miller has been cited for lacking records of animal acquisition, disposition, births or deaths, or even a record showing the type and number of animals present at the zoo, in violation of 9 C.F.R. § 2.75(b)(1). Ex. 3 at 3.

Without complete and medical accurate records, inspectors cannot monitor the health and well-being of Miller's animals and confirm whether he has provided any given animal with adequate veterinary care. Ex. 1 ¶¶ 58-59; *see id.* ¶ 21. Moreover, without accurate identification of animals and acquisition and disposition records, inspectors are unable to accurately track animal deaths or movements in the case of disease or contagious illness. *Id.* ¶¶ 59-60. Miller has failed to keep the required records, and the United States is likely to succeed on the merits of Claim 6.

In sum, the overwhelming evidence shows that Miller violated the AWA and its regulations and standards. The United States is therefore likely to succeed on the merits of its claims under 7 U.S.C. § 2146(c).

18

## II. Irreparable Harm Is Likely Absent an Injunction.

Absent preliminary injunctive relief, the United States is likely to suffer irreparable harm, meaning harm that "cannot be remedied through a monetary award after trial." *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005). Here, the requested injunction is essential to prevent irreparable harm to animals at Miller's Facility during the pendency of this case. Additionally, the United States' interest in enforcing the AWA and its regulations and standards and furthering the AWA's purpose of ensuring humane care for animals will be irreparably harmed absent injunctive relief. *See* 7 U.S.C. § 2131; *see also McKenzie v. City of Chi.*, 118 F.3d 552, 556 (7th Cir. 1997) (holding a unit of government will suffer irreparable harm if it cannot enforce a beneficial law).

Irreparable harm to Miller's animals is likely to occur at his Facility without injunctive relief. As explained above, Miller has repeatedly violated the AWA and its regulations and standards in ways that have caused animals to suffer. As they have been during the last year, animals are likely to be housed in unsanitary and unsafe conditions and be provided insufficient clean or palatable food and water. If any of these circumstances harm the animals, there is a substantial risk that, like in the past, the animals will not be provided adequate veterinary care. Given that the last inspection conducted at the Facility found that seven animals had died between the July and September 2024 inspections as well as numerous repeat AWA violations, the Facility's conditions are likely to lead to more unnecessary animal suffering, injury, and death.

Moreover, absent injunctive relief, animals that may be harmed at Miller's Facility could be sold or transferred to one of Miller's family members that lives nearby, Ex. 1 ¶¶ 45-46; Ex. 16 ¶¶ 47-49, none of whom appear to have a USDA license, limiting USDA's ability to follow up on appropriate care for the animals and to obtain relief regarding those animals later in the judicial

process. Miller has previously transferred or sold animals to his son for the winter months, preventing USDA from monitoring the health and well-being of those animals through the routine inspection process for licensed individuals. Ex. 1 ¶¶ 45-46; Ex. 16 ¶¶ 47-49; *see United States v. Weaver*, No. 23-cv-422-JFH, 2024 WL 324783, at *4 (E.D. Okla. Jan. 29, 2024) (granting preliminary injunction and explaining that "the USDA has a compelling interest in maintaining its inspection program to ensure that licensees comply with the AWA and its regulations").

The likely harm to animals at Miller's Facility is irreparable because animal suffering or death cannot be reversed after an adjudication on the merits or compensated by money damages. *See, e.g.*, *Lowe*, 2021 WL 149838, at *14 (finding a risk to the health and safety of animals in the defendants' care to be irreparable harm sufficient to support a preliminary injunction); *United States v. Envigo RMS, LLC*, No. 6:22-cv-00028, 2022 WL 1607840, at *9 (W.D. Va. May 21, 2022) (same); *Weaver*, 2024 WL 324783, at *4 (same); *United States v. Mt. Hope Auction Co.*, No. 5:24CV1520, 2024 WL 4188303, at *3 (N.D. Ohio Sept. 13, 2024) (same). In sum, without the requested relief from this Court requiring Miller to comply with the AWA and allow the United States to effectively monitor compliance, both the animals themselves and USDA's interests in upholding the law and protecting the animals are likely to suffer from irreparable harm.

### III.  The Balance of the Harms and the Public Interest Support an Injunction.

The third and fourth factors also tip sharply in favor of the United States. By enacting the AWA, Congress made clear that dealers and exhibitors must take certain actions to ensure the health and safety of regulated animals. *See* 7 U.S.C. § 2131(1) (stating that one purpose of the AWA is to insure "humane care and treatment" of animals). The government has a strong interest in ensuring compliance with federal law and regulations to promote the humane treatment of animals, as well as to ensure the efficacy of the USDA's inspection and licensing regime. *Envigo*,

20

2022 WL 1607840, at *9. It is always in the public interest to have citizens follow the law and not financially profit from law-breaking endeavors. *Id.*; *see also Lowe*, 2021 WL 149838, at *15. In contrast to the irreparable harm to the animals and USDA's interests in the absence of injunctive relief, Miller is unlikely to suffer from any irreparable harm. The requested injunction would require Miller to comply with his obligations under the AWA—the same obligations he agreed to comply with when he chose to apply (and re-apply) for an AWA license. It also restricts Miller from reaping the financial benefits of his USDA license while he is blatantly out of compliance with important AWA regulations and standards. Finally, the requested injunction requires modest additional measures designed to protect Miller's animals and help monitor his compliance, such as the requirement to create and produce veterinary records and to conduct a necropsy if an animal dies. While these measures may impose some financial cost, that cost is outweighed by the value of protecting animals from suffering and potential death and is consistent with responsible husbandry practices for a facility with an unusually high number of deaths. Thus, any hardship faced by Miller is significantly outweighed by the equities weighing in favor of the United States.

Likewise, granting the requested injunctive relief serves the public interest. The relief clearly promotes the public's interest in the United States upholding the law and ensuring the humane treatment of AWA-regulated animals, in accordance with the will of Congress expressed in the AWA. Additionally, there are practical safety concerns for members of the public who go to Miller's Facility. The Facility has recently had problems with animals escaping their enclosures that could injure members of the public. *See*, *e.g.*, Ex. 11 at 2; Ex. 12 at 3, 13, 14; Ex. 1 ¶ 42. Moreover, the human-animal interactions present a risk of disease transmission and the possibility of someone being struck by an animal's horns. Ex. 1 ¶¶ 40-41. Accordingly, the public interest strongly favors the requested injunctive relief.

In sum, the United States is entitled to injunctive relief under 7 U.S.C. § 2146(c) to enforce, prevent, and restrain the violations of the AWA set out in the United States' Complaint. Compl. (Claims 2-6). The United States is likely to succeed on the merits of these claims, irreparable harm is likely absent an injunction, and the public interest and balance of harms weigh in favor of relief.

## IV.     An Injunction Is Also Mandated Under 7 U.S.C. § 2159.

The United States is also entitled to mandatory injunctive relief because Miller has placed animals at the Facility in "serious danger" in violation of 7 U.S.C. § 2159. Miller has received the most citations for AWA violations of any USDA-licensed facility over the last two years. One inspector with 22 years' experience states that the Facility "is one of the worst facilities I have inspected, particularly with respect to its AWA noncompliance and the inadequacy of veterinary care." Ex. 16 ¶ 9. Another inspector noted that Miller "has had the highest volume of [AWA] non-compliances of any facility" she has inspected, with similar violations recurring across inspections. Ex. 1 ¶ 8. Miller's history of violations reflects a lack of concern for not just compliance with the law, but also for the hundreds of animals that depend on him and his employees for medical care, clean food, sanitation, and enrichment. USDA's most recent inspection—revealing that seven animals had died within two and a half months—confirmed the serious danger that Miller's practices pose to his animals. *See id.* ¶ 11, 60. Additionally, at least six other animals died in 2024. Ex. 12 at 17-23; Ex. 1 ¶ 17. Miller cannot be allowed to simply continue business as usual.

As evidenced by the dozens of AWA violations described above, business as usual for Miller constitutes failing to provide adequate veterinary care; allowing for unsanitary housing, food, and water; allowing unsafe housing and living conditions; and exposing animals to potential psychological distress. As just one illustrative example among the many discussed above, *see infra* at Argument Part I, a video taken by one of the inspectors at the Facility showed a duck laying on

its back—unable to right itself moments after being kicked by a zebra as members of the public were riding through the area on a horse-drawn wagon. *See* Ex. 17, 09/13/24 Video 1. Miller's practice of having a wide range of large and small animals chase wagons to obtain sufficient food predictably led to this harm. Moreover, the wagon driver did not stop to help the obviously injured animal until the USDA inspector insisted that they stop, get the duck, and ensure that it received veterinary care. *See* Ex. 1 ¶ 18; Ex. 16 ¶ 15.

Business as usual for Miller also means taking a reactive rather than proactive approach to compliance and the animals' health, "doing the minimum necessary to correct noncompliances after USDA inspectors identify them." Ex. 16 ¶ 51. With his "apathetic attitude towards the animals and his unwillingness to correct many of the AWA violations" that he has been cited for again and again, Ex. 1 ¶ 60, Miller cannot be trusted to refrain from the practices placing his animals' health in serious danger without the Court's intervention. *See id.* ¶¶ 8, 24. Accordingly, injunctive relief is mandated. *See* 7 U.S.C. § 2159(b); *Lowe*, 2021 WL 149838, at *14; *Gingerich*, 2021 WL 6144690, at *4.

## V.     The Requested Relief Is Narrowly Tailored.

The United States has attached a proposed TRO, effective beginning October 30, 2024, and for 14 days thereafter, and a proposed Preliminary Injunction, effective through the date of a final judgment. The requested relief in both proposed orders is identical, comprised of the practices that Miller must stop or start to cease violating the AWA and its implementing regulations and standards and exposing his animals to serious danger, and to ensure effective oversight of his compliance. The orders would apply to Miller; Dutch Creek Farm Animal Park; Miller's agents, servants, employees; and those working in active concert with him.

The requested relief is directly tied to the violations and the continuing serious danger faced

by the animals at Miller's Facility. First, Miller must immediately stop exhibiting, breeding, acquiring, or disposing of AWA-regulated animals at the Facility without the consent of the United States or a court order. *See* Proposed Orders, item 1. In inspection after inspection, Miller has shown that he cannot operate in compliance with the AWA as an animal dealer or exhibitor, and this relief prohibits him from doing so until either the United States or the Court finds that it is appropriate for him to resume USDA-licensed activity. Additionally, this relief is necessary to maintain the status quo during the pendency of the case. Miller could relocate animals to avoid compliance and USDA oversight—as he appears to have done in the past. Ex. 1 ¶¶ 45-46; Ex. 16 ¶¶ 47-49.[7] The requested relief would also prevent him from euthanizing animals in lieu of providing veterinary care, or continuing to breed and subjecting more animals to inhumane treatment and care before his violations can be permanently corrected.

Second, Miller must provide the animals with adequate veterinary care. *See* Proposed Orders, items 5 and 6. This includes daily observations to assess the animals, preventative care and grooming, and providing all required vaccinations to the dogs (including vaccinating the dogs for parvovirus and distemper). Miller continues to fall behind on basic veterinary care requirements such as parvovirus and distemper vaccinations, and this relief prevents him from doing so. *See infra* at Argument Part I(A)(2); Ex. 1 ¶¶ 21-22.

Third, to address the animal deaths that are likely to continue occurring at the Facility absent injunctive relief, *see infra* at Argument Part II, Miller must have a veterinarian conduct necropsies to determine the cause(s) or potential cause(s) of death. *See* Proposed Orders, item 8.

---

[7] It appears that Miller transferred more than 100 animals to his son last winter in a manner that prevented USDA from inspecting them. The October 18, 2024 inspection report for Miller's Facility recorded an inventory of 349 animals, the April 12, 2024 inspection report (done before Miller's acquisition from his son's facility, Foggy Bottom Farm) had an inventory of 183 animals, and the inventory for the July 1, 2024 inspection recorded 397 animals. Ex. 16 ¶ 48.

The animal deaths have occurred across a variety of animals and enclosures. *See* Ex. 1 ¶¶ 11-17. The deaths may have systemic causes (such as unsanitary conditions or unsafe features at the Facility) and/or a medical cause that is spreading among the animals (such as disease, illness, or parasite). *See id.* ¶¶ 15, 60. Requiring a necropsy is a necessary step towards understanding potential causal factors and preventing unnecessary animal deaths. *See id.* ¶¶ 15-16, 60.

Fourth, Miller must ensure that the animals are housed, handled, fed and watered, and cared for in compliance with the AWA's standards. Given the pattern of noncompliance documented by the inspectors, *see infra* at Argument Part I(C), Miller must correct the factors that are placing the animals in serious danger. This includes undertaking simple practices such as cleaning enclosures and shelters, providing sufficient quantities of clean water and uncontaminated food, cleaning and sanitizing food and water containers, and providing shelters that are sufficiently large and protect animals from the elements. *See* Proposed Orders, items 10-13.

Lastly, Miller must maintain and produce records as necessary to allow the United States and the Court to assess whether Miller has come into compliance with the AWA and eliminated the serious danger to the animals at his Facility. These records consist of a complete inventory of AWA-regulated animals, records of acquisitions and dispositions within the last year and during the pendency of the case, and veterinary records. *See* Proposed Orders, items 1-3 and 7.

## CONCLUSION

Under both 7 U.S.C. § 2146(c) and § 2159, the United States has demonstrated that preliminary injunctive relief is necessary to prevent serious danger and AWA violations that harm animals, the public, and the United States' interests while this case is pending. Accordingly, the Court should issue a TRO by October 30, 2024, and a preliminary injunction before the TRO expires.

DATED: October 23, 2024

Respectfully submitted,

CLIFFORD D. JOHNSON                    TODD KIM
UNITED STATES ATTORNEY                 Assistant Attorney General
                                       Environment & Natural Resources Division

DIRK D. DE LOR                         */s/ Devon L. Flanagan*
Assistant United States Attorney       DEVON L. FLANAGAN
Northern District of Indiana           Senior Trial Attorney
5400 Federal Plaza, Suite 1500         ANGELA MO
Hammond, Indiana 46320                 Trial Attorney
Telephone: 219-937-5500                KAMELA A. CASCHETTE
Fax: 219-852-2770                      Trial Attorney
E-Mail: Dirk.De.Lor@usdoj.gov          CHRISTIAN CARRARA
                                       Trial Attorney
                                       Wildlife & Marine Resources Section
                                       P.O. Box 7611, Ben Franklin Station
                                       Washington, DC 20044-7611
                                       devon.flanagan@usdoj.gov
                                       angela.mo@usdoj.gov
                                       kamela.caschette@usdoj.gov
                                       christian.carrara@usdoj.gov
                                       Phone:   (202) 305-0201 (Flanagan)
                                                (202) 514-1707 (Mo)
                                                (202) 305-0340 (Caschette)
                                                (202) 305-0217 (Carrara)
                                       Fax:     (202) 305-0275

                                       *Attorneys for the United States of America*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2024, I served a copy of the foregoing UNITED STATES' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION via U.S. mail on the following parties:

Vernon D. Miller
6255 North 1000 West
Shipshewana, Indiana 46565

*/s/ Devon L. Flanagan*
DEVON L. FLANAGAN